**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

I3LOGIX, INC.,

Plaintiff,

v. Case No.: 3:26-cv-315-WWB-PDB

ENHANCED VOTING LLC,

Defendant.
_________________________________/

# ORDER

THIS CAUSE is before the Court on Defendant's Motion to Dismiss (Doc. 22), Plaintiffs' Opposition (Doc. 27), and Defendant's Reply (Doc. 33). Also before the Court are Defendant's Motion to Stay Proceedings Pending Resolution of Ex Parte Reexaminations of the Asserted Patents (Doc. 45) and Plaintiff's Opposition (Doc. 47).[1] For the reasons set forth below, Defendant's Motion to Dismiss will be granted except to the extent it seeks dismissal with prejudice. Defendant's Motion to Stay will be denied without prejudice.

## I. BACKGROUND

Plaintiff owns United States Patent No. 11,670,127 (the "**'127 Patent**") and United States Patent No. 12,340,633 (the "**'633 Patent**," collectively, the "**Patents**"). (Doc. 1, ¶¶ 8–9). The Patents are entitled "Systems and Methods for Mail-in Ballot Status Reporting" and are "directed to specific methods for solving the technological problem of

[1] Defendant filed an Unopposed Motion for Leave to File Reply (Doc. 48) to the Motion to Stay. Upon review of the briefing already before the Court, the Court does not require any additionally briefing to resolve the Motion. Therefore, Defendant's request will be denied.

a lack of transparency and confidence in the monitoring and reporting of mail-in ballot materials." (*Id.* ¶¶ 8–9, 12; *see also* Doc. 1-3 at 1; Doc. 1-4 at 1). Plaintiff alleges that in conventional mail-in ballot reporting systems, "the status of each voter's paper ballot materials could not be tracked and communicated to [] voter[s] and[] election division[s] as ballot materials travelled through the postal system." (Doc. 1, ¶ 11). The Patents' claims "are directed to specific methods for solving" this problem. (*Id.* ¶ 12). As alleged, the Patents' independent claims recite a method that

> (i) create[es] multiple unique identifiers associated with a voter's information and a ballot; (ii) provid[es] at least two envelopes, each with unique identifiers or graphical representations; (iii) scan[s] each unique identifier or graphical representation at specific stages of the postal carrying process; (iii) associate[es] each unique identifier or graphical representation with a specific voter's information by matching unique identifiers between a central computing system and a postal carrier computer system; and (iv) provid[es] specific status updates to voters or election officials based on the specific stage of transit of each envelope, thereby improving transparency and confidence in mail-in ballot voting.

(Doc. 1, ¶ 18). More specifically, claim 1 of the '127 Patent recites a method wherein a central computer system monitors the status of paper ballot materials. Ballots are associated with a unique identifier that corresponds to a user of a computing device, i.e., a voter. '127 Patent, cl. 1. The central computer system generates tracking data associated with the unique identifiers, and an envelope is labeled with a bar code corresponding to the user-associated tracking data. *Id.* Users register to receive automatic reports on the status—including "not printed," "printed," "in-transit," or "delivered"—of their associated ballot materials. *Id.* This status is tracked by the central computer system and communicated to users via e-mail or text message and to an elections division via computer. *Id.* The elections division's computer sends a notification to the central computer system's communication module in the event the user's paper

ballot is rejected. *Id.* The communications module then sends the user a report regarding the rejection. *Id.*; (*see also* Doc. 1-4 at 18–19).

Similarly, claim 1 of the ’633 Patent recites a method wherein “voter information”—including a mailing address, an e-mail address, and two unique barcode identifiers, each of which is associated with one of two envelopes—is received by the processor of a computer system. ’633 Patent, cl. 1. The processor then receives an indication that the first envelope’s unique identifier has been scanned, which communicates that the first envelope has been picked by a postal carrier. *Id.* At this point, the second envelope and the voter’s mail-in ballot are inside the first envelope. *Id.* After the first envelope is scanned, the processor sends a notification to the voter’s e-mail address. *Id.* A second notification is sent to the voter’s e-mail address once the processor receives an indication that the first envelope is in transit to the voter. *Id.* A third notification is sent to the voter’s e-mail address once the processor receives an indication that the first envelope has been delivered. *Id.* A fourth notification is sent once the second envelope’s unique identifier is scanned, which communicates to the processor that the second envelope has been picked up by the postal carrier for delivery to a new destination address, i.e., an elections division. *Id.*; (Doc. 1, ¶ 26). Fifth and sixth notifications are sent once the second envelope is in transit to and has been delivered to the new address. ’633 Patent, cl. 1; (*see also* Doc. 1-3 at 19–20). Because “there is no unique identifier or barcode . . . on the ballot . . . the ballot itself is not tracked, but rather just the envelopes the ballot travels in.” (Doc. 1, ¶ 26).[2]

[2] Claim 1 of each Patent is fully reproduced in the Appendix following this Order.

Plaintiff alleges that Defendant's "Ballot Scout" product infringes one or more claims of the '127 Patent (Count I) and the '633 Patent (Count II). (*See generally* Doc. 1). Defendant moves to dismiss the Complaint with prejudice, arguing that the Patents claim patent-ineligible subject matter. (*See generally* Doc. 22). Additionally, Defendant notes that the United States Patent and Trademark Office ("**USPTO**") recently confirmed receipt of requests seeking cancellation of both Patents. (Doc. 45 at 1–2; *see also generally* Doc. Nos. 45-2, 45-4); 35 U.S.C. §§ 302–305. The USPTO will decide whether to grant the requests within three months. (Doc. 45-2 at 1; Doc. 45-4 at 1); *see also* 35 U.S.C. § 303(a). Defendant therefore requests that this action be stayed pending the proceedings or, at least, pending the USPTO's decision on whether to initiate them.

## II. LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009). Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Furthermore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

"[A]ny new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," is patentable under 35 U.S.C. § 101. However, "an important implicit exception" has long been recognized for "abstract ideas" and other patent-ineligible concepts such as "[l]aws of nature" and "natural phenomena." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotation omitted). A two-step inquiry informs whether a patent claims one of these "patent-ineligible concepts" or instead claims a "patent-eligible application[] of [the] concept[]." *Id.* at 217 (citing *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70–72 (2012)). "First, [the Court must] determine whether the claims at issue are directed to one of th[e] patent-ineligible concepts." *Id.* If the answer is yes, the Court proceeds to the second step and "must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72, 80). Because patents are presumed to be valid, "[t]he burden to prove the ineligibility of any patent claim stays with the patent challenger at all times." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1291 (Fed. Cir. 2024); *see also* 35 U.S.C. § 282(a). Here, Defendant argues that all the Patents' claims "are ineligible under § 101 because they are directed to an abstract idea

and add nothing that transforms the abstract nature of the claims into a patent-eligible application." (Doc. 22 at 6).[3]

### A. Patent Eligibility & Representativeness

In performing the two-step *Alice* inquiry, "the eligibility of multiple patent claims may be determined based on an analysis of a representative claim." *PerDiemCo LLC v. NexTraq LLC*, 720 F. Supp. 3d 1365, 1372 (N.D. Ga. 2024), *aff'd,* No. 2024-1621, 2026 WL 1379782 (Fed. Cir. May 15, 2026). "The patent challenger who identifies a claim as representative of a group of claims bears the initial burden to make a prima facie showing that the group of claims are substantially similar and linked to the same ineligible concept." *Mobile Acuity*, 110 F.4th at 1290 (quotation omitted). "Once this occurs, the burden shifts to the patent owner to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Id.* If the patent owner "does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[,] or if the parties agree to treat a claim as representative," the court may accept the challenger's assertion that a claim is representative. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). Alternatively, "if the patent owner presents a non-frivolous argument that the eligibility of the purported representative claim does not fairly represent

[3] The parties have filed a Joint Claim Construction Statement (Doc. 44) identifying disputed terms from the Patents' claims. Plaintiff proposes that all disputed terms are given their plain and ordinary meaning while Defendant proposes various alternative constructions and argues that many terms are indefinite under 35 U.S.C. § 112. (*See generally* Doc. 44). Neither party has argued that any particular claim construction dispute is relevant to the Patents' eligibility under § 101. Upon review of the relevant filings, the Court finds it is possible and proper conduct a § 101 inquiry at this juncture using the terms' ordinary meanings. *See Integrated Advert. Labs, LLC v. Revcontent, LLC*, 644 F. Supp. 3d 1031, 1037–38 (M.D. Fla. 2022) (collecting cases).

all claims in the group for purposes of eligibility, the patent challenger bears the burden to prove either that (i) the representative claim is, in fact, representative, in that any differences among the claims are not material to the eligibility analysis . . . or (ii) each separate claim . . . is ineligible for patenting." *Mobile Acuity*, 110 F.4th at 1291 (footnote omitted).

Here, Defendant argues that the Patents' claims are substantially similar and related to the abstract idea of "collecting, analyzing, and communicating mail status or location information" such that independent claim 1 of the '127 Patent is representative of all claims. (Doc. 22 at 9). It is unclear whether Plaintiff disputes claim 1's representativeness as to the remaining claims of the '127 Patent, but because Plaintiff presents no argument on the matter, the Court may accept claim 1 to be representative of the '127 Patent's claims. *See Mobile Acuity*, 110 F.4th at 1290.

Likewise, Defendant maintains that claim 1 of the '127 Patent is representative of the '633 Patent's claims, which similarly recite a method comprised of collecting, analyzing, and communicating mail status or location information and otherwise add generic implementation details that fail to materially alter what the claim is directed to. Plaintiff argues that the '633 Patent's independent claims add different physical and technological architecture to the '127 Patent's ballot-reporting system, and that the '633 patent's dependent claims fall into distinct categories of inventive concepts absent from the '127 patent.[4]

---

[4] Relying on *Agile Journeys LLC v. Walt Disney Co.*, No. 6:22-cv-2272, 2023 WL 6048798, at *3 (M.D. Fla. June 27, 2023), Plaintiff briefly argues that Defendant has failed to meet its initial burden of showing representativeness. *Agile Journeys* is unpersuasive here because it stands for the proposition that a challenger fails to meet its initial burden when it omits "any argument on the issue" of representativeness whatsoever. *Id.*

On the one hand, the Court agrees that the ’633 Patent introduces a different architecture by, for instance, reciting a multi-envelope method of tracking mail-in ballots. On the other hand, while Plaintiff sometimes distinguishes between the Patents, it fails to present “any meaningful argument [on] the [] significance” of the distinctions such that would materially alter the Court’s § 101 analysis. *Berkheimer*, 881 F.3d at 1365. As Defendant notes, the Complaint also seems to “group[] the Asserted Patents together and allege[] . . . that they recite patent-eligible subject matter.” (Doc. 33 at 2). For instance, the Complaint alleges that “the claims of the ’633 Patent Family,” i.e., the Patents collectively, “contain an inventive concept,” “are directed to specific methods for . . . the monitoring and reporting of mail-in ballot materials,” and “overcome the limitations of the prior art by providing a specific technical solution to the technological problem of allowing voters and election officials to directly monitor mail-in ballot materials.” (Doc. 1, ¶¶ 10, 12–13, 23). The Complaint also alleges that claim 1 of the ’633 Patent provides an “example” of the “technical solution” offered by the Patents’ claims. (*Id.* ¶ 26). Where “[t]he allegations in [the] Complaint make clear that the asserted claims from the Patents-in-Suit . . . are all directed to the same . . . systems and related methods,” the claims “are all substantially similar” such that treating one as representative becomes appropriate. *PerDiemCo*, 720 F. Supp. 3d at 1374. Likewise, while Plaintiff fails to identify any claim as representative of the ’633 Patent, it’s Response generally treats claim 1 as representative for the purpose of making arguments under the *Alice* inquiry. (*See* Doc. 27 at 8–9). And while Plaintiff presents separate *Alice* arguments for claim 1 of each Patent, the arguments broadly align and reveal no material differences in the inquiry required.

Additionally, the Patents include identical specification language in their "Abstract" and "Background" sections, they illustrate Plaintiff's system for mail-in ballot status reporting identically by way of the same twelve figures, and they provide identical "Detailed Description[s]" to "illustrate [the] pertinent features" of the system. (Doc. 1-3 at 1, 3–19; Doc. 1-4 at 1–18). These material overlaps in the Patents' specifications also suggest that the Patents' independent claims are substantially similar. *See PerDiemCo*, 720 F. Supp. 3d at 1375. The inclusion of additional dependent claims in the '633 Patent, which Defendant argues add implementation details and conventional technologies, does nothing to upset that conclusion. That the '633 Patent's dependent claims "recite different computing devices and different event conditions for occurrence of different events, which may result in different notifications, does not change the fact that the claims in both patents are directed to the same system and method" of collecting, analyzing, and communicating mail status or location information. *Id.*

Nonetheless, in an abundance of caution appropriate for the preliminary stage at which the Court finds the instant filings, the Court has reviewed the claims and will proceed through its *Alice* analysis treating both claim 1 of the '127 Patent and claim 1 of the '633 Patent as representative of the claims in their respective Patents. *See Mobile Acuity*, 110 F.4th at 1292. However, as explained below, both claims are directed to the idea of collecting, analyzing, and communicating mail status or location information, and the Court only distinguishes between the two as warranted by arguments that are unique to one or the other.

### B. *Alice* Step One

Defendant argues that the process of collecting, analyzing, and communicating mail status or location information is inherently abstract, as so held by multiple Federal Circuit and District Court opinions. Plaintiff responds that this characterization oversimplifies the Patents and fails to address key limitations of their claims. "[A]ll inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious." *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981). "At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim." *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016). Courts "must [instead] determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Id.*

Plaintiff argues that its "allegations show the ['633 Patent's] Claims are directed to a specific technical solution to the technical problem of improving transparency and confidence in mail-in voting while maintaining voter privacy by specifying how, when, and by what means voter and ballot information enters and propagates through the system." (Doc. 27 at 8 (emphasis omitted)). With respect to the '127 Patent, Plaintiff seems to argue that it is directed to a system of "determin[ing] how and when ballot data is stored, maintained, and shared across multiple computer platforms." (*Id.* at 13 (emphasis omitted)). Admittedly, "[m]ethod patents like the one at issue in this case present 'special problems in terms of vagueness.'" *Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*, 173 F. Supp. 3d 1324, 1329–30 (N.D. Ga. 2016) (quoting *Bilski v. Kappos*, 561 U.S. 593, 608 (2010)), *aff'd,* 708 F. App'x 684 (Fed. Cir. 2018). But Plaintiff does itself no favors by proposing descriptions that are arguably "untethered from the language

of the claims" and certainly no more concrete than Defendant's alternative. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). Defendant's description accurately captures the primary concern or "beating heart" of the Patents. *Mobile Telecomms.*, 173 F. Supp. 3d at 1330. The Court therefore adopts it for this stage of the proceedings.

As to abstractness, "it [is] sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. "[C]ollecting information, including when limited to particular content (which does not change its character as information), [is] within the realm of abstract ideas." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (collecting cases). "[A]nalyzing information," whether "by steps people go through in their minds, or by mathematical algorithms," is likewise an "essentially mental process[] within the abstract-idea category." *Id.* at 1354 (collecting cases). "[M]erely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* And because methods and systems of tracking shipped items typically involve collecting, analyzing, and presenting (or communicating) information, patents for such methods and systems are frequently found to be ineligible under § 101. *See Mobile Telecomms.*, 173 F. Supp. 3d at 1330–31 (collecting cases). However, a significant exception exists for a method whose "primary concern (or beating heart) [is] a specific piece of technology or technological problem." *Id.* at 1331. For example, claims "directed to a specific improvement to the way computers operate" are not abstract. *Enfish*, 822 F.3d at 1336.

Plaintiff argues for the exception. Relying on *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), Plaintiff contends that the '633 Patent claims a method offering a "specific technical solution to the technical problem of improving transparency and confidence in mail-in voting while maintaining voter privacy." (Doc. 27 at 8 (emphasis omitted)). In *McRO*, "[t]he patents relate[d] to automating part of a preexisting 3–D animation method." 837 F.3d at 1303.[5] Stated simply, the representative claim "focused on a specific asserted improvement in computer animation" and therefore passed *Alice* step one. *Id.* at 1314. More specifically, the "prior art method use[d] multiple 3–D models of a character's face to depict various facial expressions made during speech" in a "subjective process" that was "very tedious and time consuming" for animators to perform. *Id.* at 1303–06 (quotations omitted). In essence, the process consisted of animators manually entering into a computer a string of "morph weight" values between 0 and 1. *Id.* at 1304. The values would "morph[] the character's expression between [a] . . . neutral model" representing "the resting, neutral facial expression of an animated character," and other models representing the visual expression of a certain sound's pronunciation, or "phoneme." *Id.* at 1303 (quotation marks omitted). The patent claimed a method for automating this process "through the [automatic] use of rules . . . to set the morph weights and transitions between phonemes." *Id.* at 1313 (quotation omitted). The representative claim "require[d] that the rules be rendered in a specific way: as a relationship between sub-sequences of phonemes,

[5] Defendant supplies numerous cases in which patents claiming a method of tracking and communicating the status of mail or shipped items were held to be ineligible under § 101. Notably, while Plaintiff disputes the relevance of these cases, it offers no case in which like claims were even considered.

timing, and the weight to which each phoneme is expressed visually at a particular timing (as represented by the morph weight set)." *Id.* at 1315. Because the patent was directed to a specific method of improving the prior art computer animation method, the court found the representative claim was not abstract and declined to entertain *Alice* step two. *See id.* at 1314, 1316.

*McRO* is inapposite because the Patents here do not claim a method of rules that improve a specific defect in the relevant technology. The claims may recite a method that implements computer systems, scanners, and rules governing "whether and how graphical representations or identifiers are created, placed on envelopes, scanned, and matched with voter information." (Doc. 27 at 9). But neither the rules, nor the Patents more broadly, purport to improve computer functionality. "[I]nstead, [they recite] a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1363 (Fed. Cir. 2023) (quotation omitted). Scanners and bar codes are invoked in the same way—as tools that help implement an abstract process. *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017) (finding similar method abstract where claims were not "directed to a new barcode format[ or] an improved method of generating or scanning barcodes").

Plaintiff leans heavily on the argument that its Patents overcome the technological problem of improving transparency in the mail-in voting process and protecting voter privacy. (*E.g.*, Doc. 27 at 20). Voter privacy is not a technological problem to which the Patents are directed, as the Patents make no mention of improving it. *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) ("[W]e have

repeatedly held that features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo*/*Alice* analysis."). Increased transparency in mail-in voting is a claimed benefit over the prior art but hardly represents a specific technological problem—if anything, increased transparency is itself an abstract idea. Moreover, the Patents tend to hedge their fleeting and overly vague claims of improvement. *See* '127 Patent, at [57], col. 5 l. 26–27; '633 Patent, at [57], col. 5 l. 31–32. Thus, even if transparency was a specific technological improvement, it would be in no reasonable sense the primary concern of the representative claims. Rather, the claims, as a whole, are directed to collecting, analyzing, and communicating mail status or location information. "The fact that [Plaintiff] has automated the process of [communicating mail status] in a particular way does not . . . render the ultimate idea behind its patent different or unique in substance from the general idea itself." *Mobile Telecomms.*, 173 F. Supp. 3d at 1331.

Plaintiff also emphasizes and reemphasizes different aspects of the specific architecture of its claimed systems. For instance, Plaintiff argues that the '633 Patent claims "specific rules for whether and how graphical representations or identifiers are created, placed on envelopes, scanned, and matched with voter information." (Doc. 27 at 9 (emphasis omitted)). Likewise, Plaintiff highlights that the USPTO withdrew its § 101 rejection after the claims were amended to clarify "how graphical representations are converted [into] graphical representation data with a scanner, and how that graphical representation and its associated data are also associated with a voter/ballot" (*Id.* (quotation omitted)). As an initial matter, "[C]ourts are not required to defer to Patent Office determinations as to eligibility." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023); *see also PerDiemCo*, 720 F. Supp. 3d at 1372 n.2. But Plaintiff's

argument is also unpersuasive because "communicating information about a mail [or network] object" remains an abstract idea despite the inclusion of a "personalized marking," unique identifier, scanner, or other feature or component that merely implements the idea without offering a physical-realm improvement, such as in "networking or computer functionality." *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 889–90 (Fed. Cir. 2019) (quotation omitted); *see also Secured Mail*, 873 F.3d at 911; *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018).

More broadly, the Court appreciates that the Patents' methods are not lacking in the number of steps required. However, at *Alice* step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). A byzantine method can still be directed to an abstract idea. *See Bridge & Post*, 778 F. App'x 882, 889–90 ("The specificity of claim 1 does not change the fact that, as a whole, the claim is directed to the abstract idea of communicating information using a personalized marking."). A new, more involved, and perhaps improved method of tracking mail can still be directed to collecting, analyzing, and communicating mail status or location information. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea."). Plaintiff seemingly disputes this conclusion, arguing that "*Enfish* makes clear that claims are not abstract when they recite a specific improvement in the operation of a computer-implemented system, even if built on conventional hardware." (Doc. 27 at 17). This characterization is indefensible as "[t]he *Enfish* claims, understood in light of their specific limitations, were unambiguously directed to an improvement in computer capabilities,"

rather than in an abstract idea facilitated by conventional use of computer components. *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016); *see also Enfish*, 822 F.3d at 1335–36. Here, the claims are directed to an abstract idea, and while computers and other components help to facilitate that idea, the claimed methods hardly focus on bringing forth a specific technological improvement. The Court thus proceeds to *Alice* step two.[6]

### C. *Alice* Step Two

To reiterate, at *Alice* step two, the Court "examine[s] the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." 573 U.S. at 221 (quotation omitted). An inventive concept is "'an element or combination of elements that . . . ensure[s] that the patent in practice amounts to significantly more' than a patent on the abstract idea itself." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1363 (Fed. Cir. 2020) (quoting *Alice*, 573 U.S. at 217–18). Whether a patent claims significantly more than an abstract idea is a question of law. *Id.* (citing *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018)). The Federal Circuit has held that, "[t]o save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

[6] The Court notes that Plaintiff inserts into its step one arguments fleeting references to the Patents' lack of preemptive effect. As Defendant notes, however, "where a patent's claims are deemed only to disclose patent ineligible subject matter under the *Alice* framework, as they are in this case, preemption concerns are fully addressed and made moot." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).

Conversely, the Federal Circuit has held that an inventive concept is present when "the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry," which presents a question of fact. *Berkheimer*, 881 F.3d at 1367 (quotation omitted); *see also id.* at 1368. Therefore, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126–27 (Fed. Cir. 2018).[7] In *Aatrix*, pertinent allegations suggested "that the claimed combination improve[d] the functioning and operation of the computer itself." *Id.* at 1127–28. For instance, Aatrix alleged that its "claimed software use[d] less memory, result[ed] in faster processing speed, and reduce[d] the risk of thrashing[,] which ma[de] the computer process forms more efficiently." *Id.* at 1127. And in seeking leave to file a second amended complaint, Aatrix sought to add additional "specific" allegations related to its claimed advance of "import[ing data] into [a] viewable electronic form," which "eliminat[ed] the need for hand typing in the [data] and . . . the risk of transcription error." *Id.* (quotation omitted). The Federal Circuit found that, at least after the inclusion of these additional allegations, it would be improper to conclude that Aatrix's claims were directed to well-understood, routine, and conventional activity. *Id.* at 1128–29.

[7] This is in clear tension with *RecogniCorp*'s admonition that an inventive concept must be evident in the claim itself. Accordingly, some Federal Circuit judges have argued that *Aatrix* and *Berkheimer* improperly injected factual disputes into what was previously a question of law. *See Personalized Media Commc'ns, LLC v. Netflix Inc.*, 475 F. Supp. 3d 289, 298 n.4 (S.D.N.Y. 2020) (citing cases). That issue is, of course, "above this Court's pay grade," *id.*, and the Court will thus consider both whether the Patents claim significantly more than an abstract idea (a question of law) and whether, as supported by the Complaint, the Patents claim more than the performance of well-understood, routine, and conventional activities previously known to the industry (a question of fact).

Here, by contrast, Plaintiff attempts to plead itself to *Alice*-inquiry success through conclusory allegations of inventiveness. Plaintiff alleges that

> The independent claims of the '633 Patent Family expressly recite unconventional, non-routine limitations that provide a specific technical solution to a technological problem that is unique to mail-in ballot technology (*i.e.*, how to provide transparency into and instill voter confidence in mail-in ballot voting) . . . . The specifications of the '633 Patent Family describe the claimed physical components (*i.e.*, scanner and databases), the claimed envelopes with graphical representations, the claimed unique identifiers associated with voter and ballot information, the claimed rules for whether and how graphical representations or identifiers are created, scanned, or matched with voter and ballot information, and the claimed status updates directly to users as inventive features.

(Doc. 1, ¶¶ 18–19 (paragraph breaks omitted)). As an initial matter, alleging a technological improvement in voter transparency is no more convincing at step two than it was at step one. *See Elec. Power Grp.*, 830 F.3d at 1353 (stating that steps one and two of the *Alice* inquiry "are plainly related" and "involve overlapping scrutiny of the content of the claims"). Thus, this case is less like *Aatrix* and more like *Simio*, because Plaintiff's allegations of improvement "just repackage assertions of non-abstractness [the Court has] already rejected as a matter of law." 983 F.3d at 1365. Nor is Plaintiff's reliance on *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), particularly persuasive. There, the claims addressed an improvement in the "conventional functioning of Internet hyperlink protocol." *Id.* at 1257. Here, Plaintiff fails to allege, argue for, or claim an improvement to a relevant technology. To the extent that the Patents claim an improvement in the collecting, analyzing, and communicating of mail status information, "limiting an abstract idea to one field of use . . . d[oes] not make the concept patentable." *Bilski*, 561 U.S. at 612. And even if Plaintiff's conclusory allegations pertained to actual technological improvements, the Complaint would still be lacking

factual allegations sufficient to plausibly suggest such improvements exist or are claimed. *See Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 533 (Fed. Cir. 2021) ("Boom's allegations that the limitations of its claims are not routine or conventional do not preclude dismissal under Rule 12(b)(6)."); *see also Simio*, 983 F.3d at 1365.

Plaintiff's reversion back to the specific architecture of its claims thus remains unpersuasive at step two. The Court respects that "inventions [] often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination." *Parks v. Booth*, 102 U.S. 96, 102 (1880). But such combinations claim an inventive concept where they "offer a technology-based solution" rather than "an abstract-idea-based solution implemented with generic technical components in a conventional way." *Bascom*, 827 F.3d at1349; *see also BSG Tech*, 899 F.3d at 1290 ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."). Here, the solution to the problem of transparency in mail-in voting is a method of collecting, analyzing, and communicating mail status or location information, and nothing in the Complaint or the claims suggests that the method's technical components are used in a way that is either unconventional or amounts to significantly more than a patent on the abstract idea itself.

Indeed, despite Plaintiff's insistence that the Patents claim inventive concepts, Plaintiff fails to make clear what the inventive concepts even are. *Cf. Agile Journeys*, 2023 WL 6048798, at *3 (M.D. Fla. June 27, 2023) ("Plaintiff has alleged that [its patent] contains at least six distinct categories of inventive concepts" and has gone "to great lengths to explain which claims fall within each category." (quotation omitted)). Plaintiff's

clearest articulation of an inventive concept concerns "the claimed architecture" of the '127 Patent, which improves transparency and privacy "by tying scan-generated events to envelope-level identifiers rather than ballot content itself." (Doc. 27 at 20). But incorporating scanners in a conventional manner does not supply either Patent with an inventive concept. *Secured Mail*, 873 F.3d at 912. Nor does the inclusion of envelope-level identifiers, i.e., barcodes associated with a unique voter identifier. *See id.* (stating that such use of barcodes—where "[t]he claim language does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it"—has been "conventional [since] 2001"). Nor does the addition of a computer system or communications module. *See Alice*, 573 U.S. at 226 ("[W]hat petitioner characterizes as specific hardware—a data processing system with a communications controller and data storage unit . . . is purely functional and generic." (quotation omitted)). And zooming out to view the claims as an ordered combination reveals only that the combination is "replete with routine steps, including affixing mail identification data" to an envelope and "submitting" the envelope "to a mail carrier for delivery." *Secured Mail*, 873 F.3d at 911 (quotations omitted). In sum, then, "the asserted claims cite well known and conventional ways to allow generic communication [about mail status] . . . using generic computer technology" and "a personalized identifier." *Id.* at 912. This "has long been a conventional concept." *Id.*

The Patents' shared specification helps confirm this conclusion. "[W]here the specification admits the [] claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show [otherwise]." *Riggs Tech. Holdings, LLC v. Cengage Learning, Inc.*, No. 2022-1468, 2023 WL 193162, at *4 (Fed.

Cir. Jan. 17, 2023) (quotation omitted); *see also Weisner v. Google LLC*, 51 F.4th 1073, 1083–84 (Fed. Cir. 2022). Here, the specification expressly stipulates to the generic nature of the communications module, (*e.g.*, '633 Patent at col. 11, ll. 14–16), and describes the remaining components in purely generic terms, (*e.g.*, *id.* at col. 4, ll. 60–64, col. 8, ll. 64–67). Even the method as a whole is acknowledged to be routine or well understood by those skilled in the art. *See id.* at col. 4, ll. 7–10 ("advantages[] and novel features of this new technology . . . will become apparent . . . upon examination of the following description and figures"); *id.* at col. 11, ll. 52–55 ("modifications to the above general description may be accomplished by those skilled in the art to facilitate monitoring and reporting of paper ballot status data by the elections division").

In short, Plaintiff patented an abstract idea implemented through the conventional use of a computer and other generic components. Nothing about those components or the ordered combination of the claims suggests that the Patents amount to significantly more than a patent on the abstract idea itself. And neither Plaintiff's allegations of improvement in ballot transparency, nor its conclusory allegations of inventiveness, are sufficient to survive *Alice* step two at the motion to dismiss stage.

**D. Leave to Amend & Stay Pending Reexamination**

Defendant moves for dismissal with prejudice, and Plaintiff requests leave to amend. "Whether the claim elements or the claimed combination are well-understood, routine, [or] conventional is a question of fact" that depends on "the complaint, the patent[s], and materials subject to judicial notice." *Aatrix*, 882 F.3d at 1128. Plaintiff will therefore be given an opportunity to file an amended pleading that corrects, to the extent possible, the deficiencies noted above. In repleading, Plaintiff should be mindful that "[n]o

amendment to the complaint can alter what the [Patents themselves] state[].” *US Pat. No. 7,679,637 LLC v. Google LLC*, 164 F.4th 1373, 1380 (Fed. Cir. 2026).

As to Defendant’s request for a stay, courts have “broad discretion to grant or deny a stay pending Patent and Trademark Office reexamination of the patents-in-suit.” *eCOMSYSTEMS, Inc. v. Shared Mktg. Servs., Inc.*, No. 8:10-cv-1531-T, 2011 WL 280942, at *2 (M.D. Fla. Jan. 26, 2011) (quotation omitted). “When considering such a stay, courts consider several factors, including (1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party, (2) whether a stay will simplify the issues and streamline the trial, (3) whether a stay will reduce the burden of litigation on the parties and on the court.” *Baxa Corp. v. Forhealth Techs., Inc.*, No. 6:06-cv-0353-Orl, 2006 WL 4756455, at *1 (M.D. Fla. May 5, 2006) (citations omitted). These factors do not currently warrant a stay. The parties are direct competitors and, notwithstanding dismissal, the risk of prejudice to Plaintiff is at least higher than Defendant’s briefing suggests. *eCOMSYSTEMS*, 2011 WL 280942, at *3. Moreover, because the USPTO has not yet granted reexamination, the prospect of a stay streamlining issues or reducing the burden of litigation remains remote and speculative at this juncture. *See Am. Tech., Inc. v. Altima Computs., Inc.*, No. 6:10-cv-488-Orl, 2011 WL 13140902, at *3 (M.D. Fla. Jan. 24, 2011). However, the Court will consider a renewed motion to stay this action should the USPTO initiate reexamination proceedings.

## IV. CONCLUSION

For the reasons stated herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant’s Motion to Dismiss (Doc. 22) is **GRANTED** to the extent that the Complaint (Doc. 1) is **DISMISSED without prejudice**.

2. Plaintiff may file an amended pleading within **fourteen days** of this Order's entry. Failure to timely file an amended pleading will likely result in this action being dismissed with prejudice.
3. Defendant's Motion to Stay Proceedings Pending Resolution of Ex Parte Reexaminations of the Asserted Patents (Doc. 45) is **DENIED without prejudice**.
4. Defendant's Unopposed Motion for Leave to File Reply (Doc. 48) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida on September 17, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

## APPENDIX

| Claim 1 of the '127 Patent | Claim 1 of the '633 Patent |
|---|---|
| A method to monitor a status of envelopes and to electronically report the status to users and an elections division, wherein the elections division is separate from a central computer system, in order to facilitate improved transparency in a mail-in ballot process, comprising: | A method comprising: |
| monitoring, by the central computer system, a status of paper ballot materials for each of a plurality of paper ballots, the plurality of paper ballots including a corresponding envelope, each paper ballot associated with a unique voter identifier, wherein the status of the paper ballot materials is monitored prior to mailing the paper ballot materials to a user of a computing device, during transit of the paper ballot materials to the user, during transit of the paper ballot materials from the user to the elections division, and after the paper ballot materials have been delivered to the elections division; | receiving, by a processor of a computer system, voter and ballot data comprising: voter information associated with a ballot, wherein the voter information comprises: a mailing address; and at least one of an e-mail address or mobile device information; a first unique identifier associated with the ballot or a voter, wherein a first graphical representation of the first unique identifier is on a first envelope; and a second unique identifier associated with the ballot or the voter, wherein a second graphical representation of the second unique identifier is on a second envelope; |
| generating, by the central computer system, a first data record by associating first tracking data with a first voter identifier, wherein the first voter identifier uniquely identifies a user of a computing device; | receiving, by the processor, first data indicative of a scanning of the first graphical representation of the first unique identifier, wherein: the first envelope contains the ballot and the second envelope, the first data is further indicative that the first envelope has been picked up by a postal carrier for delivery to the mailing address, and the first data is received from a postal carrier computing system; |
| storing, by the central computer system, the first data record in a first database; | sending, by the processor based on the first data, a first status update using the e-mail address or the mobile device information, the first status update indicating that the ballot has been picked up by the postal carrier for delivery to the mailing address; |
| labeling an outside of a first envelope with a bar code that corresponds to the first | receiving, by the processor, second data indicative of the ballot being in transit to |

| | |
|---|---|
| tracking data, wherein the bar code is configured for scanning by one or more scanners during transit of the first envelope to obtain second tracking data for sending to a remote computer system; | the mailing address, wherein the second data is received from the postal carrier computing system after the first data is received; |
| receiving, via a web-site of the central computer system, a registration by the user to receive automatic reports regarding transit of the first envelope, wherein the user configures sending of the automatic reports based on at least one status selected by the user on the web-site, and wherein the at least one status includes not printed, printed, in-transit, or delivered, the at least one status indicative of delivered including an accepted status or a rejected status; | sending, by the processor based on the second data, a second status update using the e-mail address or the mobile device information, the second status update indicating that the ballot is in transit to the mailing address; |
| receiving, by the central computer system from the computing device of the user, a first predetermined event to monitor, wherein the first predetermined event is a change in status of transit of the first envelope; | receiving, by the processor, third data indicative of the ballot being delivered to the mailing address, wherein the third data is received from the postal carrier computing system after the second data is received; |
| monitoring, by the central computer system, a second predetermined event; | sending, by the processor based on the third data, a third status update using the e-mail address or the mobile device information, the third status update indicating that the ballot has been delivered to the mailing address, wherein the mailing address is a final destination of the first envelope; |
| communicating, by a communications module of the central computer system, with the remote computer system over a network periodically during transit of the first envelope, wherein the communicating comprises receiving the second tracking data from a second database of the remote computer system, and receiving an updated status associated with the second tracking data; | receiving, by the processor, fourth data indicative of a scanning of the second graphical representation of the second unique identifier, wherein: the second envelope contains the ballot, the fourth data is further indicative that the second envelope has been picked up by the postal carrier for delivery to an address associated with a destination different from the mailing address, the scanning of the second graphical representation comprises scanning the second graphical representation and converting, by a scanner, the second graphical representation into the fourth data, and the |

| | |
|---|---|
| | fourth data is received from the postal carrier computing system after the third data is received; |
| communicating, by the communications module, with the computing device of the user, the communicating including receiving and automatically reporting data of the first database to the computing device, wherein the reporting is tailored by the user on the web-site, and the reporting includes electronic communication using at least one of an e-mail to the computing device of the user, a text message to the computing device of the user, or communication with the computing device of the user via the web-site; | determining, by the processor based on information stored in a database comprising associations between voters and ballots, a match between the fourth data and the second unique identifier; |
| communicating automatically, by the communications module to the elections division, second reporting data to determine a goal criteria; | sending, by the processor based on the fourth data and the match, a fourth status update using the e-mail address or the mobile device information, the fourth status update indicating that the ballot has been picked up by the postal carrier for delivery to the address associated with the destination; |
| identifying, based on associating the second tracking data with the first tracking data, the first data record; | receiving, by the processor, fifth data indicative of being in transit to the address associated with the destination, wherein the fifth data is received from the postal carrier computing system after the fourth data is received; |
| storing, by the central computer system, the updated status in the first data record; | sending, by the processor based on the fifth data, a fifth status update using the e-mail address or the mobile device information, the fifth status update indicating that the ballot is in transit to the address associated with the destination; |
| comparing, by the central computer system, the updated status to an existing status in the first data record; | receiving, by the processor, sixth data indicative of the ballot being delivered to the address associated with the destination, wherein the sixth data is received from the postal carrier computing system after the fifth data is received; and |
| determining, based on comparing the updated status to the existing status, that the first predetermined event has occurred; | sending, by the processor based on the sixth data, a sixth status update using the e-mail address or the mobile device information, the sixth status update |

| | |
|---|---|
| | indicating that the ballot has been delivered to the address associated with the destination. |
| determining, based on the comparing the updated status to the existing status, that the second predetermined event has occurred; | |
| in response to determining that the first predetermined event has occurred, automatically sending, by the central computer system to the computing device of the user, a first electronic communication including the updated status; | |
| in response to determining that the second predetermined event has occurred, comparing, by the central computer system, the updated status against the goal criteria to determine a match; | |
| receiving, by the communications module from a computer of the elections division, a notification of rejection of a paper ballot of the user; and | |
| sending, by the communications module, an electronic report to the user regarding the rejection of the paper ballot. | |